# In the United States Court of Federal Claims

No. 15-572L
(Filed: November 30, 2016)

| | | |
|---|---|---|
| JAMES DOYLE, et al., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | Fifth Amendment Takings, Breach of Contract, Ripe Claims, Statute of Limitations |

*Roger J. Marzulla*, Washington, DC, for plaintiff. *Nancie G. Marzulla*, Washington, DC, of counsel.

*Jacqueline C. Brown*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, with whom were *John C. Cruden*, Assistant Attorney General, for defendant. *Daniela Arregui*, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, of counsel.

**O P I N I O N**

**FIRESTONE**, *Senior Judge*.

Pending before the court is a motion filed by defendant the United States ("the government") to dismiss the above-captioned case pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") for lack of subject-matter jurisdiction and RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.[1] Plaintiffs

[1] On April 14, 2016, the court dismissed for lack of jurisdiction Count II of the complaint, which alleged that plaintiffs are entitled to compensation under the Wilderness Act. Pub. L. No. 88-

James Doyle, a real estate developer doing business as Rocky Mountain Ventures ("RMV"), and his wholly owned limited partnership Environmental Land Technologies, Ltd. ("ELT"), filed this action claiming that the government had taken property owned in the name of ELT without paying just compensation in contravention of the Fifth Amendment of the Constitution. In the alternative the plaintiffs allege that the government breached a contract to acquire up to 2,440 acres of property that ELT owns or owned at the time of the alleged taking.[2]

These claims arise in connection with a government-approved Habitat Conservation Plan ("HCP") to protect and provide critical habitat for the Mojave desert tortoise under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*, in the area of Washington County, Utah. The ESA was enacted in 1973 to protect endangered and threatened species and the ecosystems on which they depend. *See id.* § 1531(b). The Act directs the listing as endangered or threatened those species that are "in danger of extinction throughout all or a significant portion of [their] range." *Id.* §§ 1532(6), 1533. Under the ESA, "critical habitat" necessary for the preservation of a listed species is generally designated at the time the species is listed. *Id.* §§ 1532(5), 1533(a)(3),

577-78 Stat. 896, (ECF No. 19). The plaintiffs agreed that their property was not subject to the Wilderness Act.

[2] Plaintiffs state that ELT owned the property in question. Compl. ¶¶ 1-2 (ECF No. 1). Only the owner of property, at the time of claim accrual, has standing to assert a regulatory takings claim. *Air Pegasus of D.C. Inc. v. United States*, 424 F.3d 1206, 1212 (Fed. Cir. 2005).

(b)(6)(C). Under Section 9 of the ESA, it is unlawful to "take" a listed species. *Id.* § 1538(a)(1)(B).

The government argues that the plaintiffs' takings claim must be dismissed because it is not ripe for review. The government contends that under Federal Circuit precedent property owners may assert a takings claim based on government regulatory actions under the ESA only after the property owner has first sought and been denied permission by the federal government to develop land that is within an area designated as critical habitat. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1345-52 (Fed. Cir. 2002); *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359 (Fed. Cir. 2009), *on remand*, 92 Fed. Cl. 373, *aff'd*, 418 Fed App'x. 920 (Fed. Cir. 2011). The government explains that while Section 9 of the ESA prohibits any unauthorized "take" of a listed species, including disturbance of a protected species' critical habitat, Section 10 of the ESA, authorizes individuals and non-federal entities to apply for an "incidental take permit" from the federal government to allow for development under specified conditions. *See* 16 U.S.C. §§ 1538-1539.[3] The government argues that until plaintiffs have sought and been denied an ESA Section 10 permit, plaintiffs cannot show the extent of any regulatory limits on development of their land and thus cannot establish a ripe

[3] An applicant seeking an incidental take permit must submit to the United States Fish and Wildlife Service ("FWS") a HCP setting forth: (i) the likely impact of the take; (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding to do so; (iii) what alternative actions to the take were considered and rejected; and (iv) what other measures the agency might require as necessary and appropriate. 16 U.S.C. § 1539(a)(2)(A); *see also* 50 C.F.R. § 17.32.

Fifth Amendment takings claim. *See Seiber v. United States*, 364 F.3d 1356, 1365 (Fed. Cir. 2004) (citing *Palazzolo v. Rhode Island,* 533 U.S. 606 (2001)) (finding that the "crux" of the ripeness analysis is whether "the permissible uses of the property are known to a reasonable certainty").

In 1996, the government approved a Habitat Conservation Plan and Implementation Agreement and issued an Incidental Take Permit for Washington County that allowed for development in some areas and precluded development in other areas, including areas where plaintiffs own land. However, the government argues that the permit held by Washington County does not prevent plaintiffs from seeking their own Section 10 permit to develop lands within the area now within the protected reserve established by the HCP. It is not disputed that plaintiffs have not sought or been denied an incidental take permit of their own to develop any portion of the ELT property at issue. The government argues that until plaintiffs seek a Section 10 incidental take permit from the federal government, the federal government has not made a final decision regarding what if any development of the plaintiffs' property will be approved. In such circumstance, the government argues that plaintiffs' Fifth Amendment takings claim is not ripe and must be dismissed.[4]

[4] On September 9, 2016, the parties submitted a joint status report detailing the current status of the Section 10 incidental take permit issued to Washington County. The permit expired on March 14, 2016. In the same report the parties indicated that the government is still working on but has not yet completed a comprehensive plan for the long-term management of the Red Cliffs National Conservation Area which includes plaintiffs' land. Both parties however stated that there is no reason to stay the case pending the completion of the plan.

The government argues further that to the extent its actions under the ESA in listing the tortoise, designating critical habitat, or approving the HCP in 1996 gave rise to a taking of plaintiffs' property without just compensation, on the grounds that those actions are found to be binding on plaintiffs, the government's actions took place more than six years before the plaintiffs filed their complaint and thus the case is barred by the statute of limitations. 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). The government similarly argues that the inclusion of plaintiffs' property within the Red Cliffs National Conservation Area[5] occurred more than six years before plaintiffs filed suit and thus any takings claim based on that designation alone is also barred by the statute of limitations. *See* Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, § 1974, 123 Stat. 991 (2009).

Finally, the government argues that the plaintiffs' breach of contract claims based on alleged commitments by the government in the HCP or the Implementation Agreement to buy plaintiffs' land must be dismissed for failure to state a claim.[6]

---

[5] As discussed *infra*, the Red Cliffs National Conservation Area was established in 2009 by the Omnibus Public Land Management Act § 1974. Plaintiffs' land was included within the boundaries of the Red Cliffs National Conservation Area, and the Secretary of the Interior was given authority to sell certain public lands in order to fund the purchase of private land within the area.

[6] The Implementation Agreement was drafted in December 1995 alongside the HCP. The Implementation Agreement incorporated the HCP and was created to set forth the responsibilities of the parties in order to best accomplish the goals of the HCP. On February 23, 1996, the Implementation Agreement was signed by the Town of Ivins, the State of Utah (acting by and through the Utah Department of Natural Resources), BLM, FWS, and Washington County.

Specifically, the government argues that the federal government never entered into a binding agreement with plaintiffs or otherwise agreed to purchase the plaintiffs' property under the HCP or Implementation Agreement.  The government argues that the provisions in the HCP and Implementation Agreement only provide for voluntary land exchanges or sales between "willing buyers and sellers" and provide that landowners who do not enter into an exchange or sale are not bound by the HCP.

The plaintiffs argue in response that their takings claim is timely and ripe. They also argue that they have alleged sufficient facts to establish a breach of contract claim. Specifically, the plaintiffs contend that the HCP established a compensation mechanism for purchasing the plaintiffs' property and that it is the failure of that mechanism in 2010 or so that gives rise to the takings claim.  Plaintiffs contend that the government took their property because they lost use of their land during the period in which negotiations for purchase of their land were ongoing having agreed to be bound by the HCP. They argue that they had only agreed to have their land included within the HCP's protected area in exchange for the government's promise to either purchase or exchange plaintiffs' land for land outside the protected habitat area.  They argue their takings claim is ripe because it would be futile for them to seek an incidental take permit from the federal government.  According to plaintiffs, the government's failure to complete that acquisition process and either purchase or exchange property for plaintiffs' land gives rise to both a taking and breach of contract claim.

For the reasons that follow, the government's motion to dismiss is **GRANTED**.

## I. FACTUAL BACKGROUND[7]

Mr. Doyle, acting through RMV and ELT, began acquiring land in the early 1980s in the area of St. George, Utah, in Washington County with the goal of constructing a real estate development including luxury homes and nine golf courses. Overall, plaintiffs allege that they acquired a total of 2,440 acres for development while holding preferential rights to an additional 11,000 acres. After procuring water rights, designing transportation corridors, and acquiring zoning rights, Mr. Doyle was prepared to break ground for the initial phase of his project. However, on April 2, 1990, the Fish and Wildlife Service ("FWS") listed the Mojave population of the desert tortoise as "threatened" under the ESA. 50 C.F.R. §§ 17.11(h), 17.42(e); Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Mojave Population of the Desert Tortoise, 55 Fed. Reg. 12,178 (Apr. 2, 1990). On February 8, 1994, all of the plaintiffs' land was designated as "critical habitat" for the tortoise. Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Mojave Population of the Desert Tortoise, 59 Fed. Reg. 5,820 (Feb. 8, 1994).

According to the complaint, the plaintiffs worked with other landowners and Washington County, Utah to develop an HCP that would have allowed for some

[7] Where subject matter jurisdiction is questioned, the court may consider evidence outside plaintiffs' complaint to determine whether it has jurisdiction without converting the motion to dismiss to one for summary judgment. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011). The facts set forth below thus include the undisputed facts the government has submitted in support of its motion to dismiss for lack of ripeness or in the alternative to dismiss on the grounds that the statute of limitations has run.

development of ELT's property under an incidental take permit. That HCP was, however, rejected by the FWS. A second HCP was submitted by Washington County and, on February 23, 1996, the FWS issued an incidental take permit that incorporated the revised HCP. The HCP called for the creation of a 61,022 acre "Mojave Desert habitat reserve" within Washington County. The revised HCP does not allow for development in the area of ELT's property. Issuance of Permit for Incidental Take of Threatened Species, 61 Fed. Reg. 26,529 (May 28, 1996). Both the HCP and the Implementation Agreement dated December, 1995 and signed in 1996, include language with regard to private lands in the area designated as habitat.

Section 3.1 of the HCP states "[t]he central element of this HCP is the creation of a Mojave Desert habitat reserve in Washington County. This proposed reserve will be of 61,022 acres in size and will be managed for the protection of the Mojave Desert tortoise and other listed . . . species." Section 3.2 of the HCP includes an Acquisition Strategy which states:

> [A]pproximately two-thirds of the proposed reserve is under BLM or State Park ownership. The remaining third comprises parcels currently under State or private ownership that are needed to make the reserve contiguous and effective. Three acquisition strategies have been identified to facilitate the acquisition of these necessary private lands. . . *Land will be acquired or exchanged upon the principle of a willing seller and willing buyer. Landowners have been consulted throughout the HCP process and have been encouraged to participate in these land exchanges. In the event they do not, the HCP will have no legal effect on their property and the HCP will place no restrictions on land use within the reserve.*"[8]

[8] The plaintiffs claim that Congress endorsed the HCP's land acquisition strategies based on a 1996 provision regarding a potential exchange of land with the Water Conservancy District of Washington County, Utah. In that law, Congress stated that "[i]n acquiring any lands and any interests in lands in Washington County, Utah, by purchase, exchange, donation or other

(Emphasis added). The Implementation Agreement further states that no person who is not a party or participating city is to be deemed a third party beneficiaries and that no person other than a party or participating city has a right to enforce the agreement. Implementation Agreement at 22 ("No persons who are not parties . . . are intended to be deemed third Party beneficiaries under this Agreement . . .").

Using the acquisition authorities provided for in the HCP and Implementation Agreement, the federal government, between 1996 and 2006, acquired approximately 534 acres of plaintiffs' property for a total of $9,273,013 in exchanged land and money. Def.'s Mot. 7-8. Negotiations for further acquisition of the plaintiffs' property were unsuccessful, including negotiations from 1997 to 1998 for the acquisition of 1,865 acres, negotiations from 2000 to 2007 for the acquisition of 10 acres, and negotiations from 2008 to 2011 for 9 acres. Aside from the land acquired from plaintiffs, BLM has been able to successfully acquire 8,814 acres of land within the reserve, of which 5,219 acres were acquired from private landowners.

Congress established the Red Cliffs National Conservation Area in 2009. *See* Omnibus Public Land Management Act § 1974. The statute required the Secretary of the

---

transfers of interest, the Secretary of the Interior shall appraise, value, and offer to acquire such lands and interests without regard to the presence of a species listed as threatened or endangered or any proposed or actual designation of such property as critical habitat for a species listed as threatened or endangered pursuant to the Endangered Species Act of 1973 (16 U.S.C. § 1531 *et seq*.)." Omnibus Parks and Public Lands Management Act § 309(f). Congress did not, however, allocate resources to purchase the private lands in the reserve. This provision was apparently enacted to ensure that that land would be valued based on its former fair market value, as opposed to its present value under encumbrance of the ESA.

Interior to develop a comprehensive management plan for the area, which could incorporate the HCP, and authorized the Secretary of the Interior to sell certain public land and use the proceeds to purchase private land within the conservation area. *Id.* §§ 1974, 1978. The statute did not place any additional restrictions on development by private land owners. As noted, plaintiffs' land falls within this National Conservation Area.

In 2010, the plaintiffs transferred all but 274 acres of the 2,400 acres at issue in this case to the plaintiffs' creditors under an approved bankruptcy plan. Compl. at 7. The government subsequently acquired approximately 29 acres of the transferred land from two of the plaintiffs' creditors for a total of $4,000,000 in land and money; those creditors also donated to the government land valued at $2,000,000.

### A. District Court Action

On September 20, 2013, Mr. Doyle and ELT filed an action against Secretary of the Interior Sally Jewell, the FWS, the BLM, and Washington County in the United States District Court for the District of Utah. *Doyle v. Jewell*, No. 2:13-CV-861-CW, 2014 WL 2892828, at *1 (D. Utah June 26, 2014). Mr. Doyle and ELT asserted that the federal defendants "(1) ha[d] failed to implement a comprehensive management plan [for the Red Cliffs National Conservation Area] to [the plaintiffs'] detriment; (2) ha[d] unreasonably delayed acquiring [the plaintiffs'] property; and (3) ha[d] acted arbitrarily and capriciously in failing to comply with [the defendants'] commitments" in violation of the Administrative Procedure Act ("APA"). *Doyle*, 2014 WL 2892828, at *1.

On June 26, 2014, the district court granted in part and denied in part the federal defendants' motion to dismiss the plaintiffs' claims. The court noted that "while the Secretary is not required to purchase land," the Red Cliffs legislation requires her "to implement the management plan to address how land within the area will be managed." *Id*. at *2. On May 19, 2015, Mr. Doyle, ELT, and the federal defendants filed a joint stipulation and motion for entry of judgment, in which they agreed that judgment could be entered against the federal defendants requiring the development of a comprehensive plan. The district court granted the motion on May 27, 2015, and ordered the federal defendants to develop a comprehensive plan for the long-term management of the Red Cliffs National Conservation Area as required by 16 U.S.C. § 460www(d)(1) on or before June 30, 2016. The federal government was given an extension of time and is still working on a long-term plan.

**B. Litigation in this Court**

The plaintiffs filed their complaint in this court on June 5, 2015. On August 18, 2015, the government filed a motion to dismiss (ECF No. 8). Plaintiffs' filed their response (ECF No. 9) on September 18, 2015, and the government filed its reply (ECF No. 10) in support of its motion on October 5, 2015.

The case was then stayed for a period of time to allow the parties to discuss settlement. Because those negotiations could not resolve all claims, the court met again with the parties and on April 14, 2016, the court issued an order requiring additional briefing on whether the 6-year statute of limitations set in 28 U.S.C. § 2501 bars plaintiffs' claims, as alleged by the government. The plaintiffs filed their supplemental

brief (ECF No. 22) on May 20, 2016, the government filed its response (ECF No. 25) on June 24, 2016, and the plaintiffs filed their reply (ECF No. 26) on July 8, 2016. The parties on September 9, 2016, provided the court with a status report on the current status of the incidental take permit, the HCP and Red Cliffs National Conservation Area comprehensive plan. Oral argument was heard on November 7, 2016.

## II.   JURISDICTION AND LEGAL STANDARDS

This court's subject matter jurisdiction over cases involving Fifth Amendment takings and contract disputes is set by the terms of the Tucker Act, 28 U.S.C. 1491(a). It is a plaintiff's burden to prove that subject matter jurisdiction is appropriate in this court by a preponderance of evidence. *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). In deciding whether jurisdiction is proper in a motion to dismiss under Rule 12(b)(1), the court accepts as true only uncontroverted factual allegations in the complaint. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011); *Cedars-Sinai Med. Ctr. v. Watkins*. 11 F.3d 1573, 1584 (Fed. Cir. 1993). Where the jurisdictional facts are questioned, the court must consider and resolve the disputed jurisdictional facts. The court's consideration of facts outside the complaint in such cases does not convert the motion to dismiss into one for summary judgment. *Engage Learning*, 660 F.3d at 1355 (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)).

When deciding a motion to dismiss for failure to state a claim upon which relief may be granted, the court must accept as true all the factual allegations in the complaint. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). A plaintiff

opposing a motion to dismiss for failure to state a claim must demonstrate that the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). In deciding the motion, the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged," and that the plaintiff is plausibly entitled to the relief sought. *Id*.

## III. DISCUSSION

In Count I of their complaint, plaintiffs allege a regulatory taking of their land without just compensation. In Count III, plaintiffs allege a breach of contract when the government failed to pay for or exchange plaintiffs' land. "It has long been the policy of the courts to decide cases on non-constitutional grounds when that is available, rather than reach out for the constitutional issue." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009) (citing *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206 (2009). Accordingly, the court shall first consider plaintiffs' breach of contract claim before addressing the takings claim.

### A. Plaintiffs Cannot State a Claim for Breach of Contract.

Plaintiffs present two theories for breach of contract. Plaintiffs first argue that they were parties to the HCP and that the government breached the contract when it failed to pay just compensation for the land or provide land of equal value in exchange. Pl.'s Resp. 15-16. Alternatively, plaintiffs argue that they are third party beneficiaries under the HCP and the Implementation Agreement. *Id.* at 16-19.

In order to state a claim for breach of contract against the United States the plaintiff must allege facts to show that it is in privity of contract with the government. *See*

*Pac. Gas & Elec. Co. ex rel. Brown v. United States,* 838 F.3d 1341 (Fed. Cir. 2016) (citing *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003)). Ordinarily only signatories to a contract have privity of contract with the government. *See Anderson*, 344 F.3d at 1351; *Castle v. United States*, 301 F.3d 1328, 1339 (Fed. Cir. 2002) (finding that shareholders of a party were not parties to the contract because they "neither negotiated with, nor promised any performance to, the government."). The purpose of limiting breach of contract suits to parties to the contract is to prevent recovery from parties with whom the government did not negotiate and to whom the government did not intend to obligate itself. *See generally Erickson Air Crane*, 731 F.2d at 813 (rejecting claims of subcontractors as lacking standing to sue under the Tucker Act).

However, the Federal Circuit has recognized that a plaintiff may state a claim if the plaintiff can show that it is a "third party beneficiary" of the contract. *Sullivan v. United States*, 625 F.3d 1378, 1380 (Fed. Cir. 2010). Designation as a third party beneficiary to a government contract is an "exceptional privilege" that "should not be granted liberally." *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230 (1912); *Flexfab L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005). In *Glass v. United States*, the Federal Circuit articulated the standard that a third party beneficiary can only state a claim by demonstrating that "the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." 258 F.3d 1349, 1354 (Fed. Cir. 2001); *see also Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (stating same). A prospective third party beneficiary need not be named as such in the contract, but must nevertheless demonstrate

that the claimed benefit is not "purely incidental and not contemplated by the contracting parties," and that he falls within a class clearly intended by the parties to benefit from the contract." *Sullivan*, 625 F.3d at 1380; *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999).  If a plaintiff can establish privity or third party beneficiary status, a plaintiff must also be able to establish "an obligation or duty arising out of the contract, a breach of that duty, and damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (citations omitted).

In interpreting a contract, the court looks first to the plain language of the contract. *See Aleman Food Servs., Inc. v. United States*, 994 F.2d 819, 822 (Fed. Cir. 1993); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  The plain language of the contract will be controlling if it is unambiguous.  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040–41 (Fed. Cir. 2003); *TEG–Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When the contract's language is unambiguous it must be given its plain and ordinary meaning and the court may not look to extrinsic evidence to interpret its provisions." (internal quotation marks and citations omitted)).

Tested by these standards, plaintiffs cannot state a claim for breach of contract in this case.  Plaintiffs contend that they are parties to the HCP and Implementation Agreement due to Mr. Doyle's participation as a voting member of the steering committee which worked in conjunction with Washington County, BLM, and FWS representatives to draft both documents.  This argument is not supported.  The fact that

private individuals or entities served as members of the steering committee for an HCP does not make those persons parties to the Section 10 permit which then incorporates the HCP. The HCP was issued to Washington County only. By its terms the permit does not include Mr. Doyle or any of the other plaintiffs. In addition, the Implementation Agreement which was negotiated to implement the HCP does not include plaintiffs as parties to the Agreement. The parties to the Implementation Agreement by its terms are: the State of Utah, the Town of Ivins, BLM, FWS, and Washington County. Implementation Agreement at 25-26. As such, plaintiffs are not in direct privity with the United States based on either the HCP or the Implementation Agreement and thus their contract claim hinges on their being able to establish that they are third party beneficiaries under either document. The plain language of both the HCP and the Implementation Agreement, however, foreclose plaintiffs from stating a claim based on a third party beneficiary status.

The HCP clearly and unambiguously states with regard to private land that "Landowners have been consulted throughout the HCP process and have been encouraged to participate in these land exchanges. In the event they do not, the HCP will have no legal effect on their property and the HCP will place no restrictions on land use within the reserve." HCP at 24. The Implementation Agreement goes on to state that "No persons who are not parties . . . are intended to be deemed third Party beneficiaries under this Agreement . . . ." Implementation Agreement at 22. The Implementation Agreement goes on to explain that any benefits to third parties are "incidental," that persons not signatories to the Implementation Agreement shall not have the right to

enforce it. Implementation Agreement at 22.  Given the above-quoted plain language, plaintiffs cannot state a breach of contract claim as third party beneficiaries to either the Implementation Agreement or HCP.

Plaintiffs' contention that they should be deemed third party beneficiaries of the HCP because the HCP does not expressly discuss "third party beneficiaries" is without merit.  The argument is expressly contradicted by the terms of the Implementation Agreement.  Section III.A of the Implementation Agreement, which incorporates the HCP by reference, states that "[i]n the event of any direct contradiction between the terms of this Agreement and the HCP, the terms of this Agreement shall control. In all other cases, the terms of this Agreement and the terms of the HCP shall be interpreted to be supplementary to each other."  Because plaintiffs' argument that they are third party beneficiaries to the HCP is in "direct contradiction" to the Implementation Agreement it must fail.

Finally, even if they could show that they are beneficiaries of these documents and could thus enforce them, the plaintiffs cannot, as discussed above, state a claim for breach of any contract duty.  The plaintiffs are not bound by the HCP or Implementation Agreement.  As discussed above, plaintiffs' participation in the acquisition mechanism established in the HCP was purely voluntary.  Private landowners were "encouraged to participate" but not required to participate in the land exchange and acquisition program. More importantly, neither of the referenced documents imposed a mandatory duty upon the government to purchase plaintiffs' property.  By their terms these documents make clear that participation by private parties is limited to voluntary transactions between

willing sellers and willing buyers.[9] Here, the government and plaintiffs were able to agree to some purchases or exchanges of plaintiffs' property but not others. Nothing in the documents plaintiffs rely upon obligated the government to pay plaintiffs "fair market value" for plaintiffs' property if they could not agree on a purchase price. Put another way, plaintiffs cannot show any legally enforceable duty on the part of the United States in the documents identified requiring the government to purchase their property when the parties failed to reach a voluntary agreement on price. As such, plaintiffs' breach of contract claim must be dismissed for failing to state a claim. The court will now turn to plaintiffs' takings claim.

**B. Plaintiffs' Takings Claim is Not Ripe.**

The Fifth Amendment to the United States Constitution states that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. In order to proceed on a takings claim premised on a regulation, a plaintiff must show that the takings claim is "ripe" for hearing. The Federal Circuit has held that a regulatory

[9] At oral argument plaintiffs suggested that the phrase "land will be acquired or exchanged upon the principle of a willing seller and willing buyer" (HCP at 23) should be read to mean only that plaintiffs are entitled to just compensation based on fair market value and not that the government was not obligated to buy their land when the parties could not agree on a price. The plaintiffs argue in effect that landowners are not free to walk away from the process identified in the HCP and Implementation Agreement and pursue their own land development strategy if negotiations with the government fail. This argument does not bear close scrutiny. The language of the HCP makes plain that if the government and landowners cannot reach agreement as willing buyers and sellers the landowners are free to walk away from the process. The HCP states on page 24 that landowners "have been encouraged to participate." It does not state that landowners are bound by the HCP. To the contrary, the HCP recognizes that if landowners do not participate with respect to certain land, "the HCP will have no legal effect on their property." HCP at 24.

takings claim ordinarily is not ripe for consideration until the government entity charged with implementing the regulation has "reached a final decision regarding the application of the regulation to the property at issue." *Barlow v. Haun, Inc.*, 805 F.3d 1049, 1058 (Fed. Cir. 2015).  This means that where the regulatory takings claim involves a permitting process, plaintiffs must demonstrate that the proposed activity has been actually prohibited by federal law. *See Seiber v. United States*, 364 F.3d 1356 at 1363. With respect to takings claims involving restrictions imposed by the ESA in particular, the Federal Circuit has required plaintiffs to show that they have applied for and have been denied an incidental take permit in order to show their takings claim is ripe for consideration. *See Morris v. United States*, 392 F.3d 1372, 1374-75 (Fed. Cir. 2004) (rejecting as unripe regulatory takings claim where no incidental take permit was sought). Indeed, even where a plaintiff has been enjoined by a court from conducting an activity on its property because of the ESA, the Federal Circuit has required that the plaintiff seek an incidental take permit in order to establish that the case is ripe. *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1348 (Fed. Cir. 2002) (rejecting a Fifth Amendment takings claim brought after plaintiff was enjoined from logging without an incidental take permit under the ESA).

In the present case, the plaintiffs do not dispute that they have not sought or been denied an incidental take permit with respect to development of any of their property within the reserve, or the later-designated Red Cliffs National Conservation Area.  Ex. 1,

Crist Decl. at ¶ 4.[10] Accordingly, under established Federal Circuit precedent, plaintiffs' takings claim must be dismissed absent the court finding an exception to the incidental take permitting requirement.

Here, the plaintiffs contend that their claim is ripe without having to seek an incidental take permit from the FWS because they were bound by the HCP and prohibited from developing the subject property when they agreed to negotiate for the sale or exchange of their land. In plaintiffs' view, because they participated in the acquisition and exchange process provided for in the HCP and under the Implementation Agreement, their land has been forever set aside for protection and they cannot obtain an incidental take permit without forfeiting the right to just compensation or possibly opening themselves to civil and/or criminal liability under the ESA. According to plaintiffs, by voluntarily agreeing to negotiate for the purchase of their property under the HCP, they are now bound by the terms of the HCP and will not be able to obtain an incidental take permit of their own. For the reasons that follow the court finds that this argument is without merit.

[10] Plaintiffs' argument that they did submit two incidental take permits through their participation in the steering committee with Washington County is unavailing. Plaintiffs' Response at 5-6. While it is true that Mr. Doyle was a member of the steering committee that was involved in the drafting of the HCP, including one that would have allowed some development of the plaintiffs' property, membership on the steering committee is not the same as personally submitting an incidental take permit application to your own land. The FWS issued the incidental take permit to Washington County that included work of the steering committee. The final submission was sent by Washington County only and not by any of the individual landowners. Thus, it cannot be said that plaintiffs have already applied for and been denied an incidental take permit that precludes development of their property.

The plaintiffs' argument hinges on the mistaken notion that agreeing in the first instance to negotiate with the government for the sale or exchange of their property on a "willing buyer and willing seller" basis they were forever bound by the development limitations in the HCP. As discussed above, the HCP and Implementation Agreement specifically stated that the HCP has "no legal effect on property [belonging to private citizens who do not enter into land exchanges or sell their property to the government] and [places] no restrictions on use of their property." Implementation Agreement at 6.

Because plaintiffs always had the option of leaving the voluntary acquisition program established in the HCP they cannot argue that their property was taken by the federal government when they agreed to enter negotiations with the government for acquiring their property within the reserve and now Red Cliffs Conservation Area. Plaintiffs made a voluntary decision not to develop their land or seek permission to develop their land in hopes that they would be able to reach an agreement with the federal government. Indeed, they have reached agreement for the sale of many acres. Where they could not agree on a price, the plaintiffs were free to seek permission to develop their land by seeking their own incidental take permit from the FWS. The plaintiffs' decision to voluntarily forbear from seeking to develop their land during the negotiation period did not give rise to a taking. By its terms, the HCP contemplated only voluntary arrangements between willing buyers and willing sellers. Thus, plaintiffs' decision to negotiate with the government for an extended period of time was not compelled by the HCP or Implementation Agreement. For this reason, the court concludes that plaintiffs cannot argue that the government took their property when the plaintiffs agreed to

negotiate with the government for the sale or exchange of the land. Unless and until the government confirms the extent of the restrictions on plaintiffs' use or development of the subject property the takings claim is not ripe. *See Morris*, 392 F.3d at 1376 (citing *Williamson*, 473 U.S. at 186); *Seiber*, 364 F.3d at 1365 (stating that *Palazzolo* established that the "crux" of the ripeness analysis is whether "the permissible uses of the property are known to a reasonable certainty").

The court also finds that the inclusion of plaintiffs' land within the designated Red Cliffs National Conservation Area as of March 30, 2009 does not alter the court's conclusion that there has not been a taking until plaintiffs seek an incidental take permit. By virtue of the National Conservation Area designation, the Department of the Interior is authorized to acquire private property within the area and limit certain uses of public lands within the designated area. The statute creating the Conservation Area did not however place any express restrictions on development of private lands located within its boundary. Under the terms of the statute, the Department of the Interior is authorized to sell federal lands located elsewhere in Washington County, in order to fund land acquisitions within the National Conservation Area. *See* Omnibus Pub. Land Mgmt. Act § 1978. The statute does not contain any proclamations with respect to specific rights or obligations as to plaintiffs' land. The conservation designation is thus not in and of itself a bar to development. As such, plaintiffs do not know the extent of any restrictions on their ability to develop their land until they seek an incidental take permit.

Plaintiffs further argue that they were not required to apply for an incidental take permit because such application would be futile. The court finds this argument

unavailing. The Federal Circuit has noted that "[f]utility is an exception to the agency final decision requirement for ripeness." *Schooner Harbor*, 92 Fed. Cl. at 381. "Once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Palazzolo*, 533 U.S. at 620. Plaintiffs' argue that any application for an incidental take permit would be futile because the HCP expressly prohibits incidental takes on reserve lands, which plaintiffs' property was classified as. *See* HCP Section 6.6 ("*Reserve Lands* are those State and private parcels located within the proposed reserve boundary presented in this HCP. No incidental take of desert tortoises will be allowed on reserve lands.").

In the instant case, the plaintiffs cannot show that applying for a section 10 incidental take permit would be futile. Although the HCP clearly contemplates disallowing development on reserve lands, it also states, as discussed above, that for those landowners who chose not to participate, "the HCP will have no legal effect on their property and the HCP will place no restrictions on land use within the reserve." HCP Section 3.2. In such circumstance, the court cannot assume that the FWS will foreclose all development of plaintiffs' land. The FWS has preserved its discretion with regard to development, by agreeing in the HCP that some development will be allowed under Section 10. Because Section 10 gives the FWS discretion to allow for development in areas designated as critical habitat under the ESA, the court cannot say that the permissible uses of the plaintiffs' property are known to a reasonable degree of certainty as contemplated by *Palazzolo*. The purpose of the Section 10 permitting

process is to give the FWS the opportunity to review and balance the competing concerns of critical habitat protection and development. Reconciling these competing goals is precisely why a party is required to seek an administrative decision before a takings claim can ripen. *Cf. Boise Cascade Corp.*, 296 F.3d at 1351.

Accordingly, because plaintiffs have failed to seek an incidental take permit and have never been denied such a permit by FWS, the court concludes that plaintiffs' claim for a regulatory taking is not ripe and must be dismissed without prejudice for lack of jurisdiction.

**C. Any Concerns Related to the Statute of Limitations are Moot.**

The final issue before the court on defendant's motion is whether plaintiffs' claims are barred by the statute of limitations. "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Plaintiffs contend that that their Fifth Amendment takings claim and breach of contract claim did not accrue until 2010 or 2011 at the latest, which is when the government allegedly cut off negotiations to purchase plaintiffs' land and thus denied just compensation for the land. Defendant argues that any takings claim would have accrued no later than 1996, when the HCP and Implementation Agreement were signed, and thus any claim for a regulatory taking would be untimely as to the statute of limitations. Defendant further argues that with regard to any breach of contract claim, the statute of limitations would not reset with every failed negotiation and that, at most, plaintiffs would only be able to argue breach of

contract with regard to the most recent negotiations for the sale of 9.02 acres, while all other acreage would be barred.

A claim against the United States first accrues when all the events have occurred that are necessary to fix the liability of the government and entitle the claimant to demand payment and sue for money. *L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1365 (Fed. Cir. 1982); *Lins v. United States*, 688 F.2d 784, 786088 (Ct. Cl. 1982). A cause of action accrues and the statute of limitations begins to run when a plaintiff is armed with the facts about the harm done to him. *United States v. Kubrick*, 444 U.S. 111, 123 (1979); *Applegate v. United States*, 25 F.3d 1579, 1581-84 (Fed. Cir. 1994).

The Federal Circuit has held that in a regulatory takings case, the statute of limitations does not begin to accrue until the claim is ripe. *Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1038 (Fed. Cir. 1997) (determining that the inquiry for the court to decide is when did a parties' "takings claim become ripe for adjudication" because that signifies "starting the statute of limitations clock."). This precedent has been consistently followed in this court. *See Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428 (Fed. Cl. 2009) (noting that "[a] regulatory taking claim is ripe (and thus accrues) when the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.")(internal quotations and citations omitted); *Royal Manor, LTD v. United States*, 69 Fed. Cl. 58, 62 (Fed. Cl. 2005) ("It is well established that an as-applied regulatory takings claim for economic damages does not ripen until there is a definitive

position regarding how the statute will apply to the particular property in question."); *Id.* at 61 ("[A] regulatory takings claim accrues at the same time that it ripens . . . .").

*Benchmark Res. Corp. v. United States* is analogous to the instant case.  In *Benchmark*, the plaintiff mining companies filed suit after the government, acting through the Office of Surface Mining Reclamation and Enforcement ("OSM"), designated certain portions of plaintiffs' property as unsuitable for surface mining. *See* 74 Fed. Cl. 458 (Fed. Cl. 2006).  The government moved to dismiss, arguing that plaintiffs' takings claim was unripe because it had never petitioned OSM for a permit application.  *Id.* at 464.  The court agreed with the government in dismissing plaintiffs' takings claim as unripe, noting that it was uncontested that plaintiffs' had not sought a permit from OSM and holding that "[b]ecause plaintiffs' takings claim does not come within the futility exception to the administrative exhaustion doctrine, the claim is not ripe for adjudication."  *Id.* at 469.  In dismissing the plaintiffs' amended complaint without prejudice, the court noted that, should plaintiffs' apply and be denied a permit by OSM in the future, they would be free to challenge that administrative decision in the Court of Federal Claims.  *Id.* at 475.

Having already determined that plaintiffs' takings claim is unripe, the court holds that plaintiffs' have not run afoul of the statute of limitations with regard to the property they own.  Precedent is clear that in a regulatory takings case, the statute of limitations does not start to accrue until the matter is ripe.  The matter will become ripe in the instant case when plaintiffs' file for a Section 10 permit and receive a decision. It is axiomatic then that a regulatory takings case which is unripe cannot be barred by the six year statute

of limitations.  Plaintiffs' remain free to seek an incidental take permit to develop their land or continue negotiations with the government for the purchase or exchange of their property. Plaintiffs' takings claim cannot be barred by the statute of limitations because the claim is not ripe.

To the extent the government argues that the statute of limitations also bars plaintiffs' claim for breach of contract, the court believes it does not require a substantive discussion.  It is clear from the analysis *supra* in Section A that plaintiffs are not parties to a contract with the government nor are they third party beneficiaries by the plain language of the Implementation Agreement.  The court has also determined that the government did not have an enforceable duty to purchase their property in any case.  Accordingly, any argument regarding the statute of limitations on this issue is moot because plaintiffs' have failed to state a claim upon which relief can be granted.  *See Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1350 (Fed. Cir. 2015) (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) for the proposition that "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits.").

## IV.   CONCLUSION

For the reasons above, the government's motion to dismiss is granted in part and denied in part. The court holds that plaintiffs' claim for a regulatory taking is not ripe and thus the government's motion to dismiss Count I of the complaint is **GRANTED**. Plaintiffs' takings claim in Count I shall be dismissed without prejudice. Additionally, the court holds that plaintiffs' claim for breach of contract fails to state a claim against the

United States. Accordingly, the government's motion to dismiss Count III of the complaint for failure to state a claim is **GRANTED**. The government's motion to dismiss based on the statute of limitations is **DENIED** as moot. The clerk is directed to enter judgment accordingly. No costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge